UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

KATHY L. LYNCH and KAREN S.      )
DUNNING,      )
      )
    Plaintiffs,      )
      )
VS.      )    Cause No. 17-cv-43 JEM
      )
SCOTT NOWLAND and the UNITED      )
STATES OF AMERICA,      )
      )
    Defendants.      )

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Comes now Diversion Investigator Scott Nowland and the United States of America, defendants herein, by their counsel Clifford D. Johnson, United States Attorney for the Northern District of Indiana, through David E. Hollar and Kathleen T. Trzyna, Assistant United States Attorneys, and submit the following memorandum of law in support of their Motion for Summary Judgment. Even taking the evidence in the light most favorable to Plaintiffs, probable cause existed for their arrest. For this reason, and those additionally stated below, the Court should grant summary judgment to the Defendants.

**PROCEDURAL BACKGROUND**

Plaintiffs, Kathy Lynch and Karen Dunning, filed a second amended complaint ("Complaint") in January 2020 against Scott Nowland, the United States, and Kathy Franko. Docket Entry ("DE") 49. All charges against Franko have been dismissed with prejudice. DE 96.

The Complaint alleges a Fourth Amendment *Bivens* claim against Nowland for false arrest and malicious prosecution, and claims against the United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1341, for false arrest and malicious prosecution.  All claims are based on Nowland's January 29, 2015, swearing out of probable cause affidavits, approved by a Porter County Deputy Prosecutor and Judge, which charged Lynch and Dunning with offenses relating to the alleged unlawful prescription and distribution of schedule III and IV controlled substances.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE
### *Lynch and Dunning's Licensure and Collaborative Agreements*

1.  Plaintiff Kathy Lynch owns and operates Kouts Family Health Care, Inc. ("KHC") (Exhibit 1, pp. 2-3; Exhibit 2, p. 3)

2.  Plaintiff Karen Dunning practiced at KHC as an Advanced Practice Nurse. (Exhibit 3, pp. 2-4; Exhibit 4, p. 8)

3.  An Indiana Advanced Practice Nurse may prescribe controlled substances in the usual course of professional practice if she (1) possesses a valid Indiana Controlled Substance Registration number; (2) possesses a valid DEA registration number; and (3) submits proof of collaboration with a licensed medical practitioner to the Indiana State Board of Nursing.  (848 Ind. Admin. Code § 5-1-1(a)(7); 848 Ind. Admin. Code § 5-1-1(d); Exhibit 5, pp. 2, 5, 15-21)

4.  Dunning obtained an Indiana Controlled Substance Registration number in 1998.  (Exhibit 6)

5.  Dunning possessed a valid DEA registration number from August 1998 to June 2010 and from October 2010 to January 9, 2015.  (Exhibit 7; Exhibit 8)

6.  Beginning in September 1983, Lynch was licensed in Indiana as a Registered Nurse.  (Exhibit 2, p. 2; Exhibit 4, p. 10)

7.  On August 12, 2014, Lynch became certified as an Advanced Practice Nurse and obtained an Indiana Controlled Substance Registration number.  (Exhibit 2, p. 2)

8.  Lynch has never been issued a DEA registration number.  (Exhibit 2, p. 2; Exhibit 5, p. 15, 22; Exhibit 9, p. 5)

9.  Lynch and Dunning signed a collaborative agreement with Dr. Lauren Harting that was effective from August 15, 2009 until Dr. Harting terminated the agreement effective March 4, 2014.  (Exhibit 4, pp. 2-9)

10. Lynch and Dunning signed a collaborative agreement with Dr. Patrick Sheets on February 13, 2014.  (Exhibit 10)

11. The Indiana State Board of Nursing did not receive the collaborative agreement until August 4, 2014.  (Exhibit 10, p. 1)

12. On September 28, 2014, Dr. Sheets terminated the agreement, effective December 28, 2014.  (Exhibit 11)

13. Around December 18, 2014, Dunning and Lynch filed a collaborative agreement with Dr. Jeffrey Smith.  (Exhibit 12)

### *Lynch and Dunning's Prescribing Practices*

14. From July 1, 2001, through June 30, 2015, Ind. Code § 35-48-3-11 read: "Only a physician licensed under I.C. 25-22.5 may treat a patient with a schedule III or

schedule IV controlled substance for the purpose of weight reduction or to control obesity." (Exhibit 13, p. 5; Exhibit 14; Ind. Code § 35-48-3-11 (2014))

15. Indiana law prohibits using a federal or state registration number issued to another person in the course of distribution of a controlled substance. (Ind. Code § 35-48-4-14(b)(2)(C))

16. From at least 2012 through September 2014, Dunning prescribed schedule III and IV controlled substances, specifically phentermine and phendimetrazine, for weight loss purposes, to KHC patients using her DEA registration number. (Exhibit 3, pp. 5-10; Exhibit 15, pp. 1-2)

17. From at least 2012 through September 2014, Lynch prescribed schedule III and IV controlled substances, specifically phentermine and phendimetrazine, for weight loss purposes to KHC patients. (Exhibit 1, pp. 13-17; Exhibit 2, pp. 4-10, 12-14)

18. Lynch issued these weight loss medication prescriptions or directed her staff to issue these prescriptions using the DEA registration numbers for Dr. Harting and Dr. Sheets. (Exhibit 5, pp. 25-31; Exhibit 1, pp. 5-8)

19. An Indiana database of prescriptions ("INSPECT") revealed that in 2012 and 2013 955 phentermine and 1093 phendimetrazine prescriptions were written under Dunning's DEA number and 860 phentermine and 787 phendimetrazine prescriptions were written under Dr. Harting's DEA number. (Exhibit 15, pp. 1-2; Exhibit 16, pp. 1-2)

### *Lynch and Dunning's Dispensing of Controlled Substances*

20. Around July 2014, local pharmacists began refusing to fill KHC patient prescriptions for phentermine and phendimetrazine.  (Exhibit 3, pp. 14-16; Exhibit 1, pp. 9-10)

21. Around August 2014, Lynch ordered phentermine and phendimetrazine under Dr. Sheets' name and DEA number.  The medications were delivered to Dr. Sheets' Rensselaer office.  Lynch then transported the weight loss medications to KHC. (Exhibit 17; Exhibit 5, p. 25, 32; Exhibit 1, p. 12)

22. In or around August and September 2014, Lynch and Dunning each personally dispensed weight loss medications ordered under Dr. Sheets' name and DEA number to their patients at KHC.  (Exhibit 3, pp. 16-20; Exhibit 5, pp. 25, 32-34; Exhibit 1, p. 11)

### *State Investigation of Dunning and Lynch's Prescribing*

23. In mid-2013, Indiana State Police ("ISP") Trooper Kathy Franko began investigating Dunning's prescriptive practices after Pharmacist Mitch Herzog complained Dunning was prescribing schedule IV drugs in violation of Ind. Code § 35-48-3-11.  (Exhibit 13, pp. 2, 4; Exhibit 5, pp. 2-3; Exhibit 18, pp. 2-3)

24. Herzog told Franko that he had called Dunning's office to report that the prescription violated Ind. Code § 35-48-3-11.  (Exhibit 13, p. 4).

25. In late 2013 or early 2014, Lynch reported to ISP that a KHC employee, Jodi Daniels, had fraudulently written herself several controlled substance prescriptions using Dunning's DEA number.  (Exhibit 5, pp. 2, 4, 8-9; Exhibit 3, pp. 11-12, 21)

26. Franko was assigned the Daniels complaint.  (Exhibit 18, p. 4)

27. During Franko's investigation of Daniels, Lynch and Dunning confirmed that Dunning, who is not a physician, had personally issued to Daniels multiple weight loss prescriptions.  (Exhibit 3, pp. 12-13, 21-22)

28. At this point, Franko informed Lynch of the prior complaint against Dunning and informed Lynch that Dunning was not authorized to prescribe schedule III and IV weight loss drugs pursuant to Ind. Code § 35-48-3-11.  Franko further told Lynch that a collaborative agreement did not supersede state law.  (Exhibit 13, p. 6; Exhibit 5, pp. 2, 6-7, 10)

29. Lynch responded to Franko that this "old law" did not apply to her practice. (Exhibit 18, p. 5)

30. On January 27, 2014, Franko contacted Defendant Nowland, a federal Drug Enforcement Diversion Investigator, to assist in her investigation of KHC.  (Exhibit 13, pp. 1-3; Exhibit 9, p. 10)

31. Nowland had not previously met Lynch or Dunning.  (Exhibit 9, p. 2-4)

32. On February 5, 2014, Nowland and Franko traveled to KHC to attempt to conduct an administrative inspection of KHC and interview Dunning regarding her prescribing of controlled substances.  (Exhibit 13, p. 3)

33. Dunning asked Lynch to accompany her during the interview.  (Exhibit 13, p. 3)

34. After conferring privately with Lynch, Dunning told Nowland and Franko she would not consent to an inspection and the meeting concluded.  (Exhibit 13, p. 3)

35. Nowland had never had a DEA registrant refuse an administrative inspection by the DEA.  (Exhibit 19, ¶3)

36. On March 21, 2014, Nowland and Franko interviewed Dr. Harting.  Dr. Harting said she never authorized Lynch to issue controlled substance prescriptions using her DEA number.  Dr. Harting learned her DEA number was being used when a drug company sales representative told her she was the second largest prescriber of controlled substances for weight loss in Indiana.  Shocked by this, Dr. Harting contacted Lynch and terminated the contract with 30 days' notice.  (Exhibit 20; Exhibit 2, p. 6)

37. During the course of the investigation, Nowland, Franko, and other DEA and ISP employees interviewed KHC patients and staff, as well as local pharmacists.  Nowland reviewed reports of the interviews in which he did not personally participate.  (Exhibit 9, p. 9; Exhibit 19, ¶ 4)

38. INSPECT records for Dunning, Dr. Sheets, and Dr. Harting were also reviewed as part of the investigation.  (Exhibit 15, p. 1-2; Exhibit 2, p. 11; Exhibit 16, pp. 1-2)

39. During the investigation, Franko made attempts to speak with Dunning about her prescriptive practices; however Dunning refused all attempted contact.  (Exhibit 18, p. 6)

40. On September 23, 2014, Nowland conducted a conference call with his DEA Supervisor Scott Brinks, DEA's Chief Counsel, Indiana Professional Licensing Agency General Counsel Michael Minglin, and the Director of the Indiana State Board of Nursing, Elizabeth Kiefner Crawford.  (Exhibit 21; Exhibit 9, pp. 6-8)

41. During the call, Minglin and Kiefner Crawford confirmed that Ind. Code § 35-48-3-11 prohibited non-physicians in Indiana, including specifically an Advanced Practice Nurse, from treating patients for weight loss or obesity with schedule III or IV controlled substances.  (Exhibit 21; Exhibit 9, pp. 6-8)

42. On December 11, 2014, in a recorded interview with Nowland and Brinks, Dr. Sheets said he never authorized Lynch or Dunning to use his DEA number to order medication for distribution or to write prescriptions for KHC patients.  (Exhibit 19, ¶ 6)

43. Dr. Sheets informed investigators that he now viewed his entire arrangement with Lynch as illegal.  (Exhibit 19, ¶ 7)

44. The Indiana Medicaid Fraud Control Unit ("MFCU") referred the Lynch and Dunning matter to Porter County Prosecutor Brian Gensel for possible criminal charges.  (Exhibit 22; Exhibit 23; Exhibit 18, p. 7)

45. In late 2014, Indiana Deputy Attorney General Drew Adams drafted probable cause affidavits in support of bringing charges against Lynch and Dunning.  (Exhibit 24; Exhibit 22; Exhibit 19, ¶ 9)

46. Nowland reviewed these probable cause affidavits before signing them on January 29, 2015. (Exhibit 25, pp. 13-24, 31-41; Exhibit 19, ¶ 10)

47. Nowland reported in the affidavits that he believed Lynch and Dunning violated the statutes identified based on either "personal knowledge" or information learned "from another law enforcement officer" and that he "reviewed relevant

records and interviewed witnesses with personal knowledge of the events." (Exhibit 25, pp. 13-24, 31-41)

48. At the time Nowland signed the affidavits he believed all statements in them were true and accurate.  (Exhibit 19, ¶ 11)

49. On January 29, 2015, Prosecutor Gensel swore out state court Informations charging Dunning and Lynch with Dealing in a schedule III controlled substance (Ind. Code § 35-48-4-2); Unlawful Practice (Ind. Code § 25-22.5-8-2), Dealing in a schedule IV controlled substance (Ind. Code § 35-48-4-2); Registration Offenses (Ind. Code § 35-48-4-14); and Conspiracy to deal in a schedule III controlled substance. (Ind. Code § 35-41-5-2).  (Exhibit 25, pp. 3-41)

50. On February 4, 2015, Porter County Superior Court Judge Roger Bradford found probable cause to issue warrants for Lynch and Dunning's arrests.  (Exhibit 25, pp. 2-4, 25)

51. On February 5, 2021, Lynch and Dunning voluntarily surrendered to the Porter County Jail and were booked.  (Exhibit 25, p. 2)

52. Lynch and Dunning were released that same day.  (Exhibit 1, p. 4)

53. Lynch went to trial in March 2016.  (Exhibit 5, p. 1)

54. At trial, Dr. Harting testified she did not give Lynch authorization to use her name or DEA number to prescribe controlled substances.  (Exhibit 5, pp. 11-14)

55. At trial, Carrie Burke, Compliance Director for the Indiana Professional Licensing Agency, testified that an Advanced Practice Nurse can only prescribe

controlled substances if she has a controlled substance registration, a DEA registration, and a collaborative agreement.  (Exhibit 5, pp. 15-21)

56. Burke further testified that an Advanced Practice Nurse with a collaborative agreement cannot issue prescriptions prior to having a controlled substance registration and DEA number.  (Exhibit 5, p. 19)

57. Dr. Sheets testified at trial he did not authorize Lynch to use his account to order pills for distribution.  (Exhibit 5, pp. 23-24)

58. Lynch testified at her trial that prescriptions for her patients were called in under Dr. Harting or Dr. Sheets' DEA numbers.  (Exhibit 5, pp. 25-31)

59. Lynch further testified that she prescribed weight loss medications under Dr. Harting's DEA number to the patients that were identified in the criminal charges. (Exhibit 5, pp. 25, 27-30)

60. Lynch confirmed at trial that she ordered weight loss pills under Dr. Sheets' account and distributed the medication at KHC.  (Exhibit 5, pp. 25, 32-34)

61. The trial court denied Lynch's motion for Judgment on the Evidence.  (Exhibit 26, p. 1)

62. A jury found Lynch not guilty.  (Exhibit 26, p. 2)

63. The State subsequently dismissed all charges against Dunning.  (Exhibit 27)

**ARGUMENT**

### I.    Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). Substantive law determines which facts are material in a lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To demonstrate a genuine issue of fact, the non-moving party must do more than simply raise some metaphysical doubt as to the material facts; rather, the non-moving party must come forward with specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252.

## II. Summary Judgment Is Proper As To All Remaining Claims.

### A. Summary Judgment is Proper on the Fourth Amendment *Bivens* Claim.

Lynch and Dunning's Complaint alleges that Nowland violated the Fourth Amendment by submitting false and misleading information to the Porter Superior Court. DE 49, ¶26. Under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), plaintiffs may under some circumstances sue federal employees for damages for alleged violations of the United States Constitution. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017). To prevail, a plaintiff must show that the defendant, through his "own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 143 (1979). A complaining witness who procures an arrest warrant violates the Fourth Amendment only if he submits the complaint "maliciously and without probable cause." *Malley v. Briggs*, 475 U.S. 335, 340-341 (1986); see also *Curtis v. Bembenek*, 48 F.3d 281, 284-286 (7th Cir. 1995). The standard is met if the witness "knowingly, intentionally, or with reckless disregard for the truth, makes false statements" in an affidavit, and those false statements are "necessary to the determination that a warrant should issue." *Archer v. Chisholm*, 870 F.3d 603, 615 (7th Cir. 2017), quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012). An officer also runs afoul of the Fourth Amendment by failing to disclose "facts that she 'knew would negate probable cause." *Archer*, 870 F.3d at 615, quoting *Beauchamp v. City v. Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003). The ultimate question is "whether a reasonably well-trained officer in [defendant's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. at 345.

### 1.  Probable Cause Supported Nowland's Affidavits.

Probable cause is an "absolute bar" to any Fourth Amendment false arrest claim. *Stokes v. Board of Educ.*, 599 F.3d 617, 622 (7th Cir. 2010). Probable cause is "not a high bar." *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). As the Seventh Circuit has put it, probable cause does not require "conclusive proof" of a crime, but only a

"reasonably grounded suspicion." *Boyce v. Fernandes*, 77 F.3d 946, 950 (7th Cir. 1996). It "requires more than bare suspicion, but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir. 1989).

An officer who receives a report of a crime from a putative witness or victim is ordinarily entitled to arrest on probable cause. *Wollin v. Gondert*, 192 F.3d 616, 625 (7th Cir. 1999). Moreover, a neutral judge's approval of the warrant provides evidence that an officer's reliance was reasonable. *Edwards v. Jolliff-Blake*, 907 F.3d 1052, 1060-61 (7th Cir. 2018). By contrast, evidence that "came to light after the arrest is not relevant to the probable cause inquiry." *Maltby v. Winston*, 36 F.3d 548, 557 (7th Cir. 1994). "The only facts relevant to determining whether probable cause existed are those known to the police when they apply for a warrant." *Beauchamp*, 320 F.3d at 745.

Here, even taking the evidence in the light most favorable to Lynch and Dunning, no trier of fact could conclude that the State lacked probable cause to prosecute Lynch and Dunning. On the contrary, the facts Nowland knew when he signed his affidavits created well-grounded reason to suspect that Lynch and Dunning violated Indiana law.

During the course of the investigation, Nowland confirmed that Ind. Code § 35-48-3-11 prohibited anyone except a physician—including a Nurse or Advanced Practice Nurse—from issuing prescriptions for phentermine and phendimetrazine. He confirmed that Dunning was nevertheless issuing prescriptions in her own name.

He further confirmed that Lynch was *de facto* issuing those prescriptions as well because she was issuing (and directing her staff) to issue prescriptions using the names and DEA numbers of Dr. Harting and Dr. Sheets without their knowledge or consent.  In addition to speaking with Dr. Harting and Dr. Sheets, Scott Nowland verified that nurses and advanced nurse practitioners lacked any authority to issue weight loss prescriptions during a conference call with his supervisor, a DEA lawyer, a State of Indiana lawyer, and the director of the Indiana State Board of Nursing.

Nowland's interviews with KHC staff, KHC patients, and local pharmacists, as well as a review of the INSPECT reports for Dunning and Dr. Harting verified that Lynch and Dunning were issuing schedule III and IV controlled substances, namely phentermine and phendimetrazine, first through prescribing and later through dispensing.  Indeed, Lynch and Dunning themselves do not deny that they, personally or through KHC staff, provided weight loss drug prescriptions and dispensed weight loss drugs.

Accordingly, at the time he signed his affidavits, a reasonable officer would have believed that probable cause existed to charge Lynch and Dunning with violating Indiana law.  Starting with Lynch, she was charged with distributing schedule III and IV controlled substances without proper prescriptive authority and with misusing another person's DEA registration.  The evidence available to Nowland as of January 2015 established that Lynch had never had a DEA registration number and did not have a controlled substance number until August 2014.  Despite this, she prescribed schedule III and IV controlled substances for weight loss throughout 2013

and 2014 using the DEA numbers of Dr. Harting and Dr. Sheets. Yet both doctors told Nowland that they never authorized her to issue such prescriptions. Nowland also knew that Lynch continued to issue these prescriptions even after Franko informed her that her actions violated Indiana law. Further, when area pharmacies started refusing to fill her prescriptions, Lynch ordered medication under Dr. Sheets' DEA number and dispensed drugs directly to her patients. A reasonable officer could infer that she knowingly and intentionally did so in an effort to continue providing her patients weight loss drugs despite being told it was illegal.

Turning to Dunning, she was charged with prescribing and later distributing schedule III and IV controlled substances without proper prescriptive authority and with distributing schedule III and IV controlled substances using Dr. Sheets' DEA number. A reasonable officer would have concluded that Ind. Code § 35-48-3-11 prohibited Dunning, an advanced practice nurse and non-physician, from prescribing schedule III or IV weight loss medications.

Further, Dunning's own actions gave Nowland plausible reason to suspect that she was violating the statute knowingly. Dunning unusually refused to consent to an administrative inspection, and she avoided attempts by Franko to discuss her prescriptive practices. When Dr. Harting terminated her collaborative agreement, Dunning immediately signed one with Dr. Sheets. Soon after Dr. Sheets terminated his agreement, she signed one with Dr. Smith. Moreover, when area pharmacies began refusing to fill Dunning's prescriptions, she began dispensing weight loss drugs

directly from KHC even though she had not ordered those drugs herself and thus had no authority to dispense them.

From these facts, a reasonable officer could infer that Dunning too dispensed and prescribed drugs in 2014 in violation of Indiana law.  In light of the above facts, any reasonable officer would have believed that Nowland's affidavits established probable cause.  This is especially so as the affidavits themselves were drafted by one state lawyer (Adams) and reviewed by another (Gensel).  The existence of probable cause is further confirmed by the neutral state court judge's decision to find probable cause on the facts alleged and order Lynch and Dunning's arrest.  *See Edwards*, 907 F.3d at 1060-61.

It is true that a jury found Lynch not guilty and that the charges against Dunning were subsequently dismissed.  But that does not undermine the conclusion that Nowland reasonably believed probable cause existed when he signed the affidavits.  As this Court previously recognized in ruling on Nowland's motion to dismiss, a "[l]ack of finding of guilt is not equivalent to a lack of probable cause."  DE 48, p. 9.  Indeed, the most relevant fact from Lynch's trial is that the trial court denied her motion for judgment after the State rested its case.  Had the case against Lynch lacked probable cause, the state court never would have let the case go to the jury. Similarly, the state's strategic decision to dismiss against Dunning in 2016 in light of Lynch's acquittal does nothing to suggest that a reasonable person would not have found probable cause to charge her in 2015.

16

Because Nowland's affidavits were true and accurate based on the facts that he knew at the time and sufficiently established probable cause, he is entitled to summary judgment on Lynch and Dunning's Fourth Amendment claim.

### 2. The Affidavits Contains No Material False Statements or Omissions.

To the extent Lynch and Dunning are arguing that the Fourth Amendment was violated because Nowland's affidavits contained false statements or material omissions, summary judgment is equally proper.  Lynch and Dunning's only claims in their Complaint as to false statements are that Nowland submitted "false and misleading information to the Porter Superior Court, particularly that Lynch and Dunning prescribed medications during periods when they did not have a collaborative agreement with a physician or that they prescribed medications in a manner contrary to the agreement and approval of the collaborative physician."  DE 49 ¶ 26.  No evidence suggests these claims are false.  Moreover, statements regarding the collaborative agreements were not the basis for the charges against Lynch and Dunning.

First, based on the evidence known to Nowland, his statements that Lynch and Dunning were prescribing "contrary to the agreement and approval of the collaborating physician[s]" was true.  Nowland confirmed with both collaborating physicians, Dr. Harting and Dr. Sheets, that they did not agree to or approve of Lynch prescribing under their DEA numbers.  The investigation also revealed that Dr. Sheets did not authorize either Lynch or Dunning to dispense medication ordered with his DEA number.  Indeed, both doctors terminated their collaborative

agreements with Lynch and Dunning based upon their belief that Lynch and Dunning were engaged in illegal prescriptive practices. This information was discussed in interviews during the investigation and confirmed through the physicians' testimony at trial.

As for the claim that Nowland falsely reported that Lynch and Dunning "prescribed medications during periods when they did not have a collaborative agreement with a physician," there are two problems with this claim. First, there is no evidence Nowland made any false statements in this regard. The affidavits truthfully relate Dr. Harting's statement that she terminated her collaborative agreement with Lynch and Dunning as of March 4, 2014. They also truthfully report that the collaborative agreement for Dr. Sheets was filed with the nursing board on August 4, 2014.

Second, any arguable misstatements on this point would be immaterial. Lynch was not charged with any substantive offenses involving dates between March 4 and August 4, 2014. (Exhibit 25, pp. 5-12). The only charges against Dunning involving that time period were for her prescribing schedule III and IV controlled substances under her own DEA number, not those of Dr. Sheets or Dr. Harting. (Exhibit 25, pp. 26-41). Dunning's violations were thus based on her direct violation of Ind. Code § 35-48-3-11, not on the collaborative agreements. Accordingly, Lynch and Dunning point to no material falsehoods that would show a Fourth Amendment violation.

As for omissions, an officer violates the Fourth Amendment only by failing to disclose facts the officer knows would negate probable cause. *Archer*, 870 F.3d at 615;

*Beauchamp*, 320 F.2d at 743.  Plaintiffs' Complaint does not allege any material omissions by Nowland when he signed the affidavits.  Moreover, even with a fuller picture of the collaborative agreements, there was still probable cause based on the interviews with Dr. Harting and Dr. Sheets, as well as the rest of the investigation, to believe that Lynch and Dunning were knowingly prescribing and dispensing weight loss drugs in violation of state law.  Consequently, no reasonable finder of fact could find for Lynch and Dunning on this point.

### 3.  Nowland Is Entitled to Qualified Immunity.

Finally, even if this Court thought that there was some question about whether Nowland's affidavits contained sufficient probable cause, or about whether they contained falsehoods or material omissions, Nowland would still be entitled to summary judgment on qualified immunity grounds.

An agent has qualified immunity from suit so long as his conduct did not violate a clearly established statutory or constitutional right known to a reasonable person.  *Reichle v. Howards*, 566 U.S. 658, 664 (2012); see also *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  In the Fourth Amendment context, a defendant will receive qualified immunity if a reasonable officer could have mistakenly believed that probable cause existed.  *Archer*, 878 F.3d at 615; *Wollin*, 192 F.3d at 622-623.

Here a reasonable agent presented with the affidavits drafted and approved by two Indiana attorneys (Adams and Gensel) would have believed probable cause existed.  Throughout 2014, Lynch and Dunning prescribed schedule III and IV weight loss prescriptions to their patients despite an Indiana statute permitting only

physicians to do so.   Lynch was informed of this statute at the outset of the investigation and nevertheless continued to issue prescriptions under Drs. Harting and Sheets' DEA numbers without their knowledge or consent.   Dunning refused contact by law enforcement officers when attempts were made to discuss the violations. When pharmacies began refusing to fill KHC prescriptions, both Lynch and Dunning illegally dispensed the medications from KHC.

Finally, Prosecutor Gensel's decision to pursue charges and Judge Bradford's approval of the warrants further show that, even if Nowland's belief in probable cause was mistaken, it was reasonable.   *See Edwards*, 907 F.3d at 1060-61.   Because qualified immunity demands no more, this Court should grant summary judgment as to Nowland.

## B. Summary Judgment Is Proper on the False Arrest Claim.

Plaintiffs assert that the acts of Nowland and other DEA employees constitute false arrest and malicious prosecution in violation of the FTCA. DE 49, ¶ 33.   The plaintiffs in an Indiana false arrest claim "must demonstrate the absence of probable cause to make the arrest."   *Ali*, 53 N.E.3d at 432; see also *Donovan v. Hoosier Park, LLC*, 84 N.E.3d 1198, 1207 (Ind. Ct. App. 2017).   "A judicial determination amounts to a prima facie showing of probable cause rebuttable only by evidence showing that the finding of probable cause was induced by fraud or false testimony."   *Ali*, 53 N.E.3d at 432-433.

As explained above, probable cause existed for both Plaintiffs' arrests.   Even if the Court disagreed, however, it should still dismiss the Indiana false arrest claim

because there is no evidence Nowland provided false testimony or fraudulently induced Porter County to prosecute Lynch and Dunning. The undisputed facts show that Lynch and Dunning knowingly prescribed schedule III and IV weight loss medication; that they were not licensed physicians; that the collaborating physicians did not agree to the use of their DEA number for prescriptive purposes; that Lynch used the DEA registration of another individual; and that when pharmacies refused to fill their patients' prescriptions, Plaintiffs dispensed medication at KHC that was purchased with Dr. Sheets' DEA number. The undisputed facts further show that Nowland confirmed that Lynch and Dunning's prescriptive practices were in violation of Indiana law with relevant state officials, and that it was the Indiana Medicaid Fraud Control Unit, not DEA, that referred the case to the Porter County prosecutor to discuss criminal charges.

Under these circumstances, no reasonable juror could find a lack of probable cause existed for Plaintiffs' arrest. Nor could a juror find that that Nowland induced Plaintiffs' arrest by fraud or false testimony. Consequently, summary judgment is proper on the false arrest claim.

## C. Summary Judgment Is Proper on the Malicious Prosecution Claim.

To prevail on a malicious prosecution claim, an Indiana plaintiff must show "that the defendant, acting with malice and without probable cause, instituted or caused to be instituted a prosecution that terminated in the plaintiff's favor." *Reynolds v. United States*, 549 F.3d 1108, 1114-1115 (7th Cir. 2008). Malice "'may be inferred from a total lack of probable cause, from the failure to make a reasonable or

suitable inquiry, and from a showing of personal animosity.'" *Id.* at 1115, quoting *Kroger Food Stores, Inc. v. Clark*, 598 N.E.2d 1084, 1089 (Ind. Ct. App. 1992).

"[A] judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent civil lawsuit alleging malicious prosecution." *Glass v. Trump Indiana, Inc.*, 802 N.E.2d 461, 467 (Ind. Ct. App. 2004). The plaintiff can overcome such a prima facie case "only by demonstrating that it was induced by false testimony, fraud, or other improper means." *Ali*, 53 N.E.3d 3d at 431. When the prosecutor independently decides to pursue criminal charges after reviewing all information obtained, there is no viable malicious prosecution claim against the complaining witness. *Bah v. Mac's Convenience Stores, LLC*, 37 N.E.3d 539, 547 (Ind. Ct. App. 2015).

As previously explained, the facts known to Nowland established probable cause to think Lynch and Dunning committed prescriptive medication fraud. Consequently, Lynch and Dunning's malicious prosecution claim falters for the same reasons as their Fourth Amendment and false arrest claims.

Moreover, Lynch and Dunning have presented no evidence of malice or personal animosity. *Compare Bah*, 37 N.E.3d at 548 (denying summary judgment where plaintiff and defendant's employee had a "contentious relationship" and "ill will"). Nowland had not met Lynch or Dunning prior to Franko asking him to join her investigation. Indeed, there is no evidence any DEA employee had animosity toward Lynch and/or Dunning or vice versa.

Finally, there is no evidence that Nowland failed to make "reasonable or suitable inquiry" into the charges. *Reynolds*, 549 F.3d at 1115. Nowland and investigating officers spent nearly all of 2014 interviewing employees and patients of KHC, the collaborating physicians, and members of the licensing and nursing boards. Nowland and others in the investigation reviewed INSPECT records documenting Dunning's prescriptions and the prescriptions written under Drs. Harting and Sheets' DEA numbers. Moreover, Lynch and Dunning do not deny prescribing and dispensing schedule III and IV prescriptions to their patients, nor does Lynch deny using the DEA numbers of her collaborating physicians. The Indiana Medicaid Fraud Unit presented the investigation to the Porter County Prosecutor's Office, who decided to proceed with charges based on the totality of the investigation. There is no evidence that Nowland's investigation was unreasonably inadequate. Consequently, summary judgment is proper on Lynch and Dunning's malicious prosecution claim, just as it is to all their other claims.

## CONCLUSION

The Court should grant summary judgment to the United States and Scott Nowland.

Respectfully submitted,

CLIFFORD D. JOHNSON
UNITED STATES ATTORNEY


By:     */s/ Kathleen Trzyna*
Kathleen Trzyna
Assistant United States Attorney
United States Attorney's Office

Northern District of Indiana
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
Tel: (219) 937-5515
Fax: (219) 937-5550
Email: kathleen.trzyna@usdoj.gov

*/s/ David Hollar*
David Hollar
Assistant United States Attorney
United States Attorney's Office
Northern District of Indiana
5400 Federal Plaza, Suite 1500
Hammond, IN 46320
Tel: (219) 937-5661
Fax: (219) 937-5550
Email: david.hollar@usdoj.gov