```
1    STATE OF INDIANA     )
                          ) SS:
2    COUNTY OF PORTER     )

3

4              IN THE PORTER SUPERIOR COURT NO. 5

5                SITTING AT VALPARAISO, INDIANA

6

7

     STATE OF INDIANA,
8
          Plaintiff,
9

10
          Vs.                        CAUSE NO.
11                                   64D05-1502-FB-000856

12

     KATHY LYNCH,
13
          Defendant.
14

15

16            TRANSCRIPT   OF   PROCEEDINGS taken in the Porter
     Superior Court No. 5 in the above captioned cause on the
17   28th day of March, 2016, before the Honorable Mary R.
     Harper, Judge of said Court.
18

19

20

21

22

23

24             STACEY E. FITTIPALDI
                Official Court Reporter
25             Porter Superior Court No. 5
```

1



EXHIBIT
5

Lynch-00003853
Exhibit 5_Page 001

```
 1    these?
 2              THE COURT:  Let me do a little housekeeping here.
 3        Get our electronics out of the way.  Admitted -- counsel
 4        for both sides, admitted exhibits go up here.  Identified
 5        but not admitted exhibits go with the Court Reporter.  No
 6        admitted exhibit goes back to counsel table.  Are we good?
 7              MR. KING:  Yes.
 8              THE COURT:  Okay.
 9                    DIRECT EXAMINATION
10    BY MR. GENSEL:
11    Q.  Would you please tell the Jury your name?
12    A.  Kathy Franko.  First name --
13    Q.  Go ahead and spell your name.
14    A.  K-a-t-h-y, last name Franko F-r-a-n-k-o.
15    Q.  Can I call you Kathy?
16    A.  Yes.
17    Q.  Kathy, would you tell us where you're currently employed?
18    A.  The Indiana Office of the Attorney General Medicaid Fraud
19        Control Unit.
20    Q.  How long have you been employed there?
21    A.  Since June of 2015.
22    Q.  Prior to that where were you employed?
23    A.  The Indiana State Police.
24    Q.  And what -- when you left the Indiana State Police what was
25        your job title?
```

                                                              96

Lynch-00003948
Exhibit 5_Page 002

```
 1        Kouts Healthcare?
 2   A.   Yes.
 3   Q.   Would you just briefly sort of tell us what it was that got
 4        you involved initially.
 5   A.   A local pharmacist reported to me that there was possible
 6        illegal prescribing of controlled substances at the Kouts
 7        Healthcare Clinic.
 8   Q.   And when you received that information what did you do?
 9   A.   I documented the information in an Indiana State Police
10        case report.  And in August of 2013, I started the
11        investigation by running Nurse Practitioner Karen Dunning's
12        prescriber history in the Indiana Board of Pharmacy INSPECT
13        program.
14   Q.   Okay.  Let's back up a little bit.  Why did you run --
15        well, first of who, who is Karen Dunning?
16   A.   Karen Dunning is a nurse practitioner that is employed by
17        Kathy Lynch at Kouts Healthcare Clinic.
18   Q.   Okay.  You mentioned something called an INSPECT report.
19        Would you tell us what that is?
20   A.   An INSPECT report, basically, is you can as a law
21        enforcement officer I could run a prescriber and see all
22        the prescriptions that their patients have filled in
23        Indiana, and I can also run patient's individually to see
24        what controlled substances they filled in Indiana.
25   Q.   Okay.  Without going into a lot of detail, when you ran
```

98

Lynch-00003950
Exhibit 5_Page 003

```
 1        at some point in the future we would attempt to meet with
 2        the two ladies at Kouts Healthcare and educate them on the
 3        laws and see if they were in compliance with the Indiana
 4        and Federal Controlled Substance Regulations.
 5   Q.   All right.  So did you manage to do that?
 6   A.   Yes.
 7   Q.   Okay.  So do you remember when that occurred?
 8   A.   Well, in January of 2014, I received a complaint from Kathy
 9        Lynch that one of her employees was possibly phoning in
10        unauthorized controlled substance prescriptions without
11        authorization.
12   Q.   And what did you do as far as follow up?
13   A.   I contacted Kathy Lynch and to gather more information on
14        that investigation.  And also I brought up the -- there
15        were possible illegal controlled substances coming out of
16        the Kouts Healthcare Clinic.  And we suspected that some of
17        it was under Karen Dunning's DEA registration.
18   Q.   What did you do subsequent to that?
19   A.   I arranged with Kathy Lynch via text message and phone and
20        I think by email, also, to meet with Kathy Lynch and Karen
21        Dunning on February 5th, 2014.
22   Q.   Did you, in fact, meet with them?
23   A.   Yes, we did.
24   Q.   And what was -- what was that meeting all about?
25   A.   I also told Kathy Lynch that we would discuss both
```

Lynch-00003952
Exhibit 5_Page 004

1   Q.   What is the procedure for a nurse in the State of Indiana

2        to get prescription authority?

3   A.   A registered nurse can obtain advanced schooling I believe

4        or part of that process is you have to have an advanced

5        pharmacology class, you have to establish a Collaborative

6        Agreement with supervising physician, you have to apply for

7        a State and be granted a State controlled substance

8        registration, and the last part of the process is a DEA

9        registration from the DEA.

10  Q.   So when you have all of those things in order then you can

11       prescribe controlled substances, is that your

12       understanding?

13  A.   Yes.  And a nurse practitioner can or even a registered

14       nurse can see patients for weight loss, for any other host

15       of problems, but she just cannot prescribe controlled

16       substances until she does those things.

17  Q.   Okay.  Let's talk a little bit about Collaborative

18       Agreements.  In your experience investigating these types

19       of cases are aware of what a Collaborative Agreement is?

20  A.   Basically.

21  Q.   What is it?

22  A.   It's an agreement between the supervising physician and the

23       nurse practitioner on how they are going to operate for

24       patient care.

25  Q.   What is its purpose?

106

```
 1        parenthesis, your name here; calling from Kouts Healthcare,
 2        ordering doctor Karen Dunning, office phone 219-766-3131.
 3        And then there are handwritten notes in there, Or on --
 4        they have Patrick Sheets handwritten in, scribbled out,
 5        looks like Lauren Harting.  In parenthesis Kathy's days
 6        except W, slash, meds, Calling in a prescription for,
 7        parenthesis, patient name, date of birth, parenthesis,
 8        00-00-00.  They're getting prescription specifying any
 9        refills or no refills.
10    Q.  Okay.  So the instruction -- is it your understanding these
11        are instructions on how to call in weight loss medicine?
12    A.  Yes.
13    Q.  Okay.  Thank you.  We discussed a little bit earlier, and
14        we went through all of the green documents that involve the
15        patient data sheets and things.  There was -- you testified
16        to a specific date that ended up being the subject of the
17        charges in the case.  Why were those dates used?
18    A.  When I spoke to Kathy Lynch on January 24th, 2014, we
19        discussed the Indiana Code 35-48-3-11, it's the Weight Loss
20        law for better terminology.  And I informed Kathy Lynch of
21        that law and later forwarded a copy of her -- or to her via
22        email.
23    Q.  Okay.  Then that begs the question, again, why did we pick
24        those particular dates?  Why did you particular -- why were
25        those dates chosen as far as the patients getting
```

134

```
 1        prescriptions on that date?
 2   A.   Because that was the date that I had informed her of the
 3        law and that nurse practitioners could not prescribe
 4        controlled substances or let me back up.  Nurse
 5        practitioners could not prescribe weight loss drugs
 6        according to that law.
 7   Q.   Okay.
 8   A.   So after I informed her of the law we picked the dates.
 9   Q.   Okay.  So you informed her of the law then subsequent to
10        that were the dates that were chosen?
11   A.   Yes.
12   Q.   Are you aware of any provisions in the law that would allow
13        an advanced practice nurse to call in a controlled
14        substance prescription under a collaborating physicians's
15        identity, authority, and DEA number?
16   A.   No.
17   Q.   You testified a little bit earlier that there did come a
18        time when the Collaborative Agreement with Dr. Harting
19        ended, to your knowledge.
20   A.   Yes.
21   Q.   I believe you testified that subsequently a Collaborative
22        Agreement was entered into with Dr. Patrick Sheets?
23   A.   Yes.
24   Q.   Is that correct?
25              MR. KING:  I'm wondering if we could have a five
```

135

Lynch-00003987
Exhibit 5_Page 007

1   A.   I talked to DEA Diversion Investigator Scott Nowlin --

2   Q.   When?

3   A.   -- regarding the case.  I don't recall.

4   Q.   Okay.  And after you talked to him then what?

5   A.   Then we determined between two of us that when -- as we got

6        time we would go and speak to the employees there at Kouts

7        Healthcare and educate them on the law.

8   Q.   And when did you get time?

9   A.   In January -- in February of 2014.

10  Q.   Actually, what you got time for in early February of 2014,

11       was, coincidentally, you received a complaint from Kathy

12       Lynch regarding an employee by the name of Jody, is that

13       correct?

14  A.   Yes, that's correct.

15  Q.   And when did you receive that complaint?

16  A.   In around January 23rd or 24th of 2014.

17  Q.   Okay.  So correct me if I'm wrong, but you get this

18       complaint from Kathy Lynch about an employee and you

19       remember hey, I was going to look at them any way, and

20       that's the approach you took, isn't it?

21  A.   No.

22  Q.   When you got contacted what was the complaint Kathy made

23       regarding her employee?

24  A.   That she was phoning in unauthorized prescriptions.

25  Q.   Prescriptions for what?

                                                              146

Lynch-00003998
Exhibit 5_Page 008

```
 1   A.  They were controlled substance prescriptions.  I don't
 2       recall exactly what the prescriptions were.
 3              MR. KING:  Could I have a moment, your Honor?
 4              THE COURT:  Sure.
 5                    CROSS EXAMINATION (CONTINUING)
 6       BY MR. KING:
 7   Q.  Do you recall the name of the employee?
 8   A.  I believe it was Jody Daniels.
 9   Q.  Okay.  Did you receive actual written documentation of the
10       complaint?
11   A.  Written documentation of which complaint?
12   Q.  Of the complaint as opposed to a phone call or email.  Do
13       you remember getting actual documentation of the complaint
14       that Ms. Franko was making?
15   A.  That Ms. Franko was making?
16   Q.  I'm sorry.  Too many Kathy's and Karen's.  That Ms. Lynch
17       was making?
18   A.  Yes.
19   Q.  Okay.
20              MR. KING:  May I have a moment, Judge?  I want to
21       have this marked.
22              THE COURT:  Okay.
23       (Defendant's Exhibit No. 1 marked for identification.)
24              MR. KING:  May I approach the witness?
25              THE COURT:  You may.
```

147

```
 1        twice all ready.
 2                   MR. KING:  Okay.  This is admitted, but I didn't
 3        take it to the table.
 4                   THE COURT:  Thank you.
 5                   CROSS EXAMINATION (CONTINUING)
 6        BY MR. KING:
 7   Q.   Now, correct me if I'm wrong, but from early in your
 8        communication with Kathy, Kathy Lynch, she expressed to you
 9        her belief, her view that she was authorized to do what she
10        was doing with regard to the two drugs based upon the
11        existence of a Collaborative Agreement with a physician, is
12        that correct?
13   A.   Well, there are a lot of generalities in that statement,
14        but basically yes.
15   Q.   Right.  And, I mean, now you not only had, but you have and
16        you expressed the different view to her, is that correct?
17   A.   I expressed the law to her.
18   Q.   And your view based on the law, correct?
19   A.   No, I expressed the law to her.
20   Q.   Well, you didn't read the statute, did you?
21   A.   I forwarded that exact statute to her via email.
22   Q.   And do you recall when that might have been?
23   A.   January 24th, 2014.
24   Q.   Okay.  And you reiterated it on February 5th, 2014, am I
25        correct?
```

166

Lynch-00004018
Exhibit 5_Page 010

1    beautiful day.  Did you all get a good lunch?  Good enough?

2    Okay.  Ready to go back to work?  Okay.  Were you all able

3    to comply with the Preliminary Instruction and not do the

4    things you're not supposed to do?  Yes?  Okay.  Great.

5    Onward and upward.

6              **MR. GENSEL:**  Your Honor, at this time the State

7    would call its next witness, Dr. Lauren Harting.

8              **THE COURT:**  Mr. Gensel, can I see you?  I have a

9    question on a totally unrelated case that I need an answer.

10   (Atty. Gensel approaches the bench.)

11             **THE COURT:**  Hi there.  Can I get you sworn,

12   please?  Your right hand.

13   (The witness raises her right hand.)

14   **THE WITNESS:**

15                       DR. LAUREN HARTING,

16   After having been first duly sworn is examined and

17   testifies as follows:

18             **THE COURT:**  Thank you.  Have a seat.  Scoot right

19   up to the microphone.

20                       **DIRECT EXAMINATION**

21   BY MR. GENSEL:

22   Q.  Good afternoon.

23   A.  Hi.

24   Q.  Would you please tell the Jury your name?

25   A.  Lauren Harting.

                                                            197

Lynch-00004049
Exhibit 5_Page 011

```
 1        I could circle it.  And, usually, she was on site so we
 2        could discuss it and, you know, what -- I would give her
 3        what I thought was advice, how this should be handled.
 4   Q.   And that went on for how many years?
 5   A.   Six.  Five.
 6   Q.   Several?
 7   A.   Right.
 8   Q.   Okay.  Did there come a point when you came to learn that
 9        Kathy Lynch was using your DEA number to call in controlled
10        substances prescriptions, specifically for weight loss?
11   A.   Yes.
12   Q.   How did that come about?  How did you find that out?
13   A.   A sales representative came into my office in Hobart and
14        had gotten to know me.  And he let me know that she was
15        writing diet pills under my name and under my DEA number.
16   Q.   Was that a surprise to you?
17   A.   Yes, very much.
18   Q.   And when you found that out what did you do?
19   A.   I went down to her office the next day and told her I was
20        done.  I gave her 30 days notice because I thought she
21        deserved that.  And when she asked why I told her why.
22   Q.   What did you tell her?
23   A.   I told her that she had been prescribing diet pills under
24        my name, and I had specifically told her I did not want to
25        do that.
```

                                                                    203

Lynch-00004055
Exhibit 5_Page 012

```
 1   Q.  And how did she respond to that?

 2   A.  She said she thought she was helping people.

 3   Q.  You testified earlier that you personally did not see

 4       patients in your role as a physician at Kouts?

 5   A.  Yes.

 6   Q.  Did you ever treat as a physician Michelle Hanford?

 7   A.  No.

 8   Q.  Mark Emerick?

 9   A.  No.

10   Q.  Yvonne Kearney?

11   A.  No.

12   Q.  Kara Henry?

13   A.  No.

14   Q.  John Maneno?

15   A.  John Maneno is my patient.

16   Q.  Okay.  What -- was he a weight loss patient of yours?

17   A.  He is not.

18   Q.  Were you aware that he was going to Kouts for weight loss

19       purposes?

20   A.  I was not.

21   Q.  During the course of the several years, whether it's four,

22       five, six years, had you known at any point along that

23       timeline that the Defendant was using your DEA number to

24       call in controlled substances, specifically weight loss?

25       At any point along that timeline if you would have found
```

Lynch-00004056
Exhibit 5_Page 013

```
 1        that out what would have been your response?
 2   A.   I would have -- I would have quit.
 3   Q.   Did you at any time ever give her authorization to use your
 4        name and/or your DEA to prescribe controlled substances?
 5   A.   No.
 6   Q.   Would you -- had she asked you would you have done that?
 7   A.   Never.
 8   Q.   Why?
 9   A.   I worked hard to earn that, and I respect it, and I would
10        not ever let anyone else use my DEA number.
11   Q.   Okay.  Have you ever allowed any other advanced practice
12        nurse to use your DEA number?
13   A.   No, I have not.
14              MR. GENSEL:  May I approach, your Honor?
15              THE COURT:  You may.
16        (Atty. Gensel approaches the bench.)
17        (State's Exhibit No. 42 marked for identification.)
18                    DIRECT EXAMINATION (CONTINUING)
19        BY MR. GENSEL:
20   Q.   Doctor, I'm showing what has been marked for purposes of
21        identification as State's Exhibit 42.  Can you identify
22        that document?
23   A.   This is a termination of my agreement with Kouts Healthcare
24        sent to the Indiana Professional Licensing Agency.
25              MR. GENSEL:  Your Honor, I would ask that 42 be
```

Lynch-00004057
Exhibit 5_Page 014

```
 1                        CARRIE BURKE,
 2      After having been first duly sworn is examined and
 3      testifies as follows:
 4              THE COURT:  Thank you.  Have a seat.  Scoot right
 5      up to the microphone, please.
 6                      DIRECT EXAMINATION
 7      BY MR. ADAMS:
 8   Q.  Good afternoon.
 9   A.  Hi.
10   Q.  Carrie, can you hear me fine?  Would you state your name,
11      please, for the record?
12   A.  Carrie Burke.
13   Q.  Carrie, would you spell your last name, please?
14   A.  B-u-r-k-e.
15   Q.  Carrie Burke.  And, Carrie, what city do you live in?
16   A.  Indianapolis.
17   Q.  And you came up today from Indianapolis to testify,
18      correct?
19   A.  Yes.
20   Q.  Very good.  Carrie, can you tell me who do you work for?
21      Who are you employed by?
22   A.  Professional Licensing Agency.
23   Q.  That's the Indiana --
24   A.  Yes.
25   Q.  -- Professional Licensing Agency.  And your title?
```

227

Lynch-00004079
Exhibit 5_Page 015

```
 1   Q.   Would you please walk us through the process.  To become an
 2        advanced practice nurse with prescriptive authority what
 3        does the practitioner -- that's not a practitioner.  What
 4        does the nurse have to do first?
 5   A.   Well, she has to have her RN license.  And then she files
 6        out an application packet, which includes the application.
 7        She has to submit the education showing that she's taken
 8        the additional education to be an advanced practice nurse.
 9        And she has to submit a Collaborative Agreement.
10   Q.   Okay.  So, first of all, they have to be a registered
11        nurse?
12   A.   Yes.
13   Q.   Can you explain to me, please, a nurse practitioner?  What
14        is a nurse practitioner?
15   A.   A nurse practitioner has more education than just a
16        registered nurse.  They do not have prescriptive authority
17        yet.  You do not have to have a license to be a nurse
18        practitioner, you just have to have that additional
19        education.
20   Q.   So the State of Indiana doesn't separately license a nurse
21        practitioner?
22   A.   No, we do not.
23   Q.   What type of additional education do they need to become a
24        nurse practitioner and use those initials at the end of
25        their name, NP?
```

230

Lynch-00004082
Exhibit 5_Page 016

1   A.  There -- it's -- I believe a Master's degree.  They can go
2       on to get their doctorate.  They have to have more
3       pharmacology classes.  It's just a lot more added than just
4       your two year RN.
5   Q.  So when an NP presents themselves to the Board and they
6       file an application for prescriptive authority, that's the
7       bear minimum they have to have?  They have to be an NP,
8       right?
9   A.  Well, they have to -- well, yeah, I mean, they could be the
10      RN.  They have to have the RN first.
11  Q.  But at that point when they come to the Board and they
12      request prescriptive authority it's -- is it at that point
13      that they present evidence that they are, in fact, an NP?
14  A.  Yes.
15  Q.  And you said -- would that be transcripts that they would
16      submit?
17  A.  Yes.
18  Q.  And submit an Collaborative Agreement?
19  A.  Yes.
20  Q.  Is the Collaborative Agreement submitted separately?
21  A.  No, it's usually submitted with the application.
22  Q.  So it's part of the application process?
23  A.  Yes.
24  Q.  Can prescriptive authority even be granted by the Pharmacy
25      Board until the entire application has been approved?

231

Lynch-00004083
Exhibit 5_Page 017

```
 1   A.   No.

 2   Q.   It's all part of one packet?

 3   A.   Yes.

 4   Q.   Would you please refer to what's has been admitted as

 5        State's Exhibit 2?  And tell me what's -- what's at the top

 6        of that document?  What does that say?

 7   A.   Article 5 Prescriptive Authority for Advanced Practice

 8        Nursing.

 9   Q.   Okay.  And, again, this is what you refer to on a daily

10        basis at work?

11   A.   Yes.

12   Q.   Would you please go to Page 2 Paragraph 8, at the very

13        bottom?  Can you read that for me, please?

14   A.   Written Practice Agreements for advanced practice nurses

15        applying for prescriptive authority shall not be valid

16        until prescriptive authority is granted by the Board.

17   Q.   Would you please go to the last page, Rule 2?  Can you read

18        that, please?  5-2-1.

19   A.   No Written Practice Agreement shall be necessary unless the

20        advanced practice nurse seeks prescriptive authority.

21   Q.   All right.  So unless -- trying to make sense of that.  It

22        makes sense to me that unless they're applying for

23        prescriptive authority they don't even need a Written

24        Practice Agreement, correct?

25   A.   No, they do not.
```

232

Lynch-00004084
Exhibit 5_Page 018

```
 1   Q.   What is the purpose of the Collaborative Agreement?  Is it
 2        the same thing as the Advanced Practice --
 3   A.   Yes, it is.
 4   Q.   -- Collaborative Agreement?  What is the main purpose for
 5        that?
 6   A.   It is so the nurse has -- is supervised by a physician.
 7        You know, there's someone to oversee that she's doing the
 8        proper job and has the proper credentialing for the job.
 9   Q.   All right.  Very good.  So the primary purpose is
10        supervision?
11   A.   Yes.
12   Q.   Correct.  All right.  And a nurse practitioner or I guess
13        an APN at that point, can they prescribe controlled
14        substances?
15   A.   Only if they have a CSR and a DEA.
16   Q.   So can they prescribe underneath a Collaboration Agreement
17        with a physician prior to that?
18   A.   No, they cannot.
19   Q.   If an applicant has problems, or if an applicant has
20        questions concerning the application process, is there help
21        available?
22   A.   Yes, there is.
23   Q.   Can you explain what help is available, please?
24   A.   Anybody can call in and ask questions of our customer
25        service representatives.  If your individual case manager
```

233

Lynch-00004085
Exhibit 5_Page 019

1    Q.   I'm sorry.  Right above that.

2    A.   Right above that?

3    Q.   Yeah.  Instructions.

4    A.   Okay.  Instructions and information for prescriptive

5         authority as an advanced practice nurse.

6    Q.   Very good.  That's what this is.

7    A.   Yes.

8    Q.   Would you please go to Page 2, and read the last paragraph

9         under the heading Indiana State controlled substance

10        registration?

11   A.   If you are an APN wanting to administer, dispense, or

12        procure controlled substances in Indiana you must obtain an

13        Indiana controlled substance registration.  The application

14        fee is $60, and can be payable to the Indiana Professional

15        Licensing Agency.  You must -- you may send the CSR and

16        prescriptive authority applications in together and include

17        one check.  Fees are nonrefundable.  After your CSR has

18        been approved you must also apply for a Federal Drug

19        Enforcement Administration, DEA, registration by going to

20        their website.  If you have further questions you may

21        contact the DEA at, then there's the phone number.

22   Q.   Very good.  Based on your knowledge and your experience,

23        your time at IPLA, is there any on-the-job training for an

24        NP who wished to prescribed without a CSR or a DEA?

25   A.   No.

237

Lynch-00004089
Exhibit 5_Page 020

```
 1   Q.  No.  Apprenticeship?

 2   A.  No.

 3   Q.  They cannot prescribe controlled substances, as the

 4       direction said, without first obtaining what?

 5   A.  They have to obtain their APN, their CSR, and their DEA.

 6   Q.  The State of Indiana just grants the CSR, and then you have

 7       to make another application to the Drug Enforcement

 8       Administration --

 9   A.  Yes.

10   Q.  Correct?  Do you know, Carrie, how many nurse practitioners

11       there are in the State of Indiana that have been granted a

12       CSR?

13   A.  I -- not off the top of my head, I'm sorry.

14   Q.  A couple?

15   A.  There's several.

16   Q.  Very good.  Are you aware, Carrie, did there come a time

17       when Kathy Lynch filed an application with the Nursing

18       Board for prescriptive authority as an advanced practice

19       nurse?

20   A.  Yes.

21   Q.  There did.

22               MR. ADAMS:  Your Honor, may I approach, please?

23               THE COURT:  You may.

24               MR. ADAMS:  Thank you.

25       (State's Exhibit No. 31 marked for identification.)
```

                                                                    238

Lynch-00004090
Exhibit 5_Page 021

```
1   Q.  All right.  Very good.  And how many names are on that
2       agreement?
3   A.  Kathy Lynch, Karen Dunning, and Lauren Harting.
4   Q.  All right.  Very good.  And did there come a time then when
5       Kathy Lynch received her prescriptive authority?
6   A.  Yes, I believe it was in August 2000 --
7   Q.  I'm sorry.  Can you tell from the writing on the
8       application when that was actually --
9   A.  August 12th, 2014.
10  Q.  All right.  Very good.  And do you know from your review of
11      the records, the documents, the information kept by IPLA
12      Nursing Board was Kathy Lynch ever granted a DEA
13      registration?
14  A.  No, she was not.
15  Q.  In her entire career was she ever granted that?
16  A.  No.
17  Q.  Would you please look at the signature page of that
18      Collaborative Agreement?  The one that was filed with the
19      Nursing Board in June of 2013.  And can you tell me when
20      was that dated?
21  A.  2009.
22  Q.  But it was filed in June of 2013?
23  A.  Yes.
24  Q.  Was that noted by anyone at IPLA or your office when that
25      came in?
```

242

Lynch-00004094
Exhibit 5_Page 022

```
 1   Q.  Thank you very much.
 2                MS. MURDAUGH:  I have no further questions.
 3                MR. GENSEL:  No redirect.
 4                THE COURT:  Okay.  It -- the attorneys have
 5        concluded their questioning.  Do I see any hands?  No
 6        questions.  All righty, sir.  You are excused.  Thank you
 7        very much.  Watch your step.
 8             Come on up.  Watch your step over there, sir, on
 9        those cords.  All righty.  Please be careful.  Take those
10        steps and face me.  Your right hand.
11        (The witness raises his right hand.)
12   THE WITNESS:
13                          DR. PATRICK SHEETS,
14        After having been first duly sworn is examined and
15        testifies as follows:
16                THE COURT:  Thanks.  Have a seat.  Get
17        comfortable.  And scoot right up to the microphone if you
18        would, please.  Thanks.
19                          DIRECT EXAMINATION
20   BY MR. GENSEL:
21   Q.  Would you tell us your name?
22   A.  Patrick Sheets.
23   Q.  And what city or town do you live in?
24   A.  Rensselaer, Indiana.
25   Q.  And what is your profession?
```

                                                              406

```
 1   A.  Uh-huh.

 2   Q.  -- were there any decisions made about going forward with

 3       that line of business?

 4   A.  We discussed moving forward on doing so.  The argument was

 5       I wasn't certain about things like INSPECT and a few other

 6       things, but I believed that we were going to move forward

 7       in the near future.

 8   Q.  Okay.  At any point in time did you order any pills from

 9       A.F. Hauser in furtherance of that plan?

10   A.  No.

11   Q.  Were you aware of whether any pills were ever ordered?

12   A.  I was.

13   Q.  Who ordered them?

14   A.  Kathy Lynch.

15   Q.  Okay.  Were you aware as to whether she personally had an

16       account with A.F. Hauser?

17   A.  Yes.

18   Q.  Okay.  Did she?

19   A.  Yes.

20   Q.  Okay.  Did you authorize -- well, what account did she use

21       when she ordered those pills?

22   A.  Mine.

23   Q.  Did you authorize her to use your account to order those

24       pills?

25   A.  No, I did not.
```

414

Lynch-00004266
Exhibit 5_Page 024

```
 1        please scoot right up to the microphone.
 2                        DIRECT EXAMINATION
 3    BY MR. King:
 4    Q.  Tell us your name, please.
 5    A.  Kathy Lynn Lynch.
 6    Q.  For the record, you are the same Kathy Lynch that's been
 7        accused in this case, is that correct?
 8    A.  Yes, sir.
 9    Q.  And how old you?
10    A.  57.
11    Q.  Where do you live?
12    A.  In Kouts.  Baums Bridge Road, Kouts.
13    Q.  And how long have you lived in Kouts?
14    A.  17 years.
15    Q.  Are you married, single, divorced?  What's your marital
16        status?
17    A.  Single.
18    Q.  Single.  Do you have kids?
19    A.  I have two.
20    Q.  Two kids.  How old are they?
21    A.  32 and 29.
22    Q.  Okay.  And I'm assuming they don't live with you, is that
23        correct?
24    A.  Correct.
25    Q.  Where did you go to high school?
```

538

Lynch-00004390
Exhibit 5_Page 025

```
 1     that?
 2  A.  What chart?
 3  Q.  This is Exhibit 25.
 4  A.  Oh, yes.
 5  Q.  I'm showing it to you.  On at the top paragraph it actually
 6      there it shows, the lower paragraph, does it not say
 7      Dr. Karen Dunning?
 8  A.  It does say that.  That's what the pharmacist says to you.
 9  Q.  Okay.  Karen Dunning wasn't a doctor, was she?
10  A.  No, she wasn't.
11  Q.  Okay.  And you can hang on to that for a second.
12  A.  Sure.
13  Q.  And when they called a prescription in of one of your
14      patients --
15  A.  Yes.
16  Q.  -- they were to say either Dr. Harting when you had
17      Dr. Harting's Collaborative Agreement, or Dr. Sheets when
18      you had Dr. Sheets' Collaborative Agreement, correct?
19  A.  Correct.  That's correct.
20  Q.  And that's what was done?
21  A.  Yes.
22  Q.  For years --
23  A.  Yes.
24  Q.  -- that's what was done.  Okay.  You were in here yesterday
25      when Dr. Harting testified?
```

                                                              604

```
 1   A.   That's correct.  There's still about 120 left in Indiana to

 2        apply.

 3   Q.   All right.  Well, let's go back to --

 4             MR. GENSEL:  May I approach?

 5             THE COURT:  You may.

 6        (Atty. Gensel approaches the bench.)

 7                  CROSS EXAMINATION (CONTINUING)

 8   BY MR. GENSEL:

 9   Q.   Let's go back to Kara Henry.  Now, on -- you're not denying

10        that you prescribed her weight loss drugs, correct?

11   A.   I'm not denying that, no.

12   Q.   Okay.  And you admit that on February 8th, 2014, if you

13        look at the February 8th entry, that you were the init

14        prov, the initiating provider, on February 8th?

15   A.   Yes.

16   Q.   Okay.  And she -- what was the diet drug that she got that

17        day?

18   A.   Phentermine.

19   Q.   Okay.

20             MR. GENSEL:  Thank you.  May I approach?

21             THE COURT:  You may.

22        (Atty. Gensel approaches the witness.)

23                  CROSS EXAMINATION (CONTINUING)

24   BY MR. GENSEL:

25   Q.   And that would have been called in under Dr. Harting's DEA?
```

Lynch-00004460
Exhibit 5_Page 027

```
 1   A.  Yes.  Any of those that are me would be Dr. Harting.

 2   Q.  I'm showing you what has been admitted as State's Exhibit

 3       13.  Can you tell me what that is?

 4   A.  Can I tell you what the page is?

 5   Q.  What is the document?

 6   A.  This document is from the program data sheet John Marino

 7       from or Maneno.

 8   Q.  Okay.  Was John Maneno one of your patients?

 9   A.  Yes, but I didn't remember him.

10   Q.  Okay.  But the document claims that he was?

11   A.  Yes.

12   Q.  All right.  And could you look again at the February -- or

13       look at the February 8th entry?

14   A.  Yes.

15   Q.  Did you prescribe him some type of diet drug that day?

16   A.  Yes, I did.

17   Q.  And what was it?

18   A.  That was Phentermine 30 milligrams.

19   Q.  Okay.  And that was prescribed utilizing Dr. Lauren

20       Harting's DEA registration, correct?

21   A.  Yes.

22   Q.  Now, showing you State's Exhibit 16.  Can you tell me what

23       that document is?

24   A.  16 is a program data sheet on Yvonne Kearney.

25   Q.  Okay.  And was she a patient of yours?
```

609

Lynch-00004461
Exhibit 5_Page 028

```
 1   A.  Yes, she was.

 2   Q.  You remember her?

 3   A.  Yes, I do.

 4   Q.  Okay.  Would you look at the entry of February 14th, 2014?

 5   A.  Yes.

 6   Q.  Was she prescribed a diet or a weight loss drug that day?

 7   A.  Yes, she was.

 8   Q.  Okay.  Again, were you the one that signed off on it?

 9   A.  Yes, I was.

10   Q.  And was it called in utilizing Dr. Lauren Harting's DEA

11       number?

12   A.  It should have been.

13   Q.  I'm now showing you State's Exhibit 19.  Can you tell me

14       what that is?

15   A.  This is Mark Emerick's program data sheet.

16   Q.  Okay.  Was Mark Emerick a patient?

17   A.  Yes.

18   Q.  And would you look at February 15th of 2014?

19   A.  Yes.

20   Q.  And did he receive weight loss drugs from your clinic on

21       that day?

22   A.  He did not.

23   Q.  On 2/15/14, Mark Emerick?

24   A.  Well, actually, you know, I have a notation written here.

25       And when that occurs it says he's going to be off for a
```

610

Lynch-00004462
Exhibit 5_Page 029

```
 1        month.  Sometimes, you know, we'll decide that in the room
 2        and the more we talk then I'll walk out and just tell the
 3        girls just leave them off for a month.  And so I had
 4        written that there on this page.  And it might have been
 5        because they go on vacation or they have surgery coming up
 6        or something like that.  But that's what it says, off times
 7        one month.
 8   Q.   Does it not say there was a pharmacy?
 9   A.   Yes, the pharmacy is listed there, but that doesn't mean it
10        was called.  So I would probably go by that.
11   Q.   Look at the front of -- front page.
12   A.   Okay.
13   Q.   Can you tell how many times on that front page that you
14        prescribed him diet pills -- diet pills?
15   A.   Three times in the year of 2012.  He was there nine months
16        out of the year of 2013.  And possibly that was it.
17   Q.   Prior to the February 15th date, what was the time closest
18        before that that you prescribed him some type of weight
19        loss drug?
20   A.   December 7th.
21   Q.   Okay.  So approximately two months earlier?
22   A.   Yes.
23   Q.   And, again, that one would have been called in under
24        Dr. Harting's DEA?
25   A.   Should have been.
```

611

```
 1   A.  It could be Tylenol with codeine.  It could be Vicodin.
 2   Q.  Okay.
 3   A.  But when you're collaborating you don't write, you call.
 4   Q.  Okay.  So you would call in utilizing Dr. Harting's DEA for
 5       Phentermine and Phendimetrazine, as well as some narcotic
 6       pain meds, you would call those in?
 7   A.  Yes.
 8   Q.  All right.  And did you -- when Dr. Harting would come and
 9       review the charts, did you ever tell her that any of those
10       call-ins that the patients who had evidence that they had
11       been prescribed controlled substances that you had called
12       those in utilizing her DEA?  Did you ever tell her that?
13   A.  There's signs in the office, yes.
14   Q.  No.  Did you ever tell her that?  Did you ever say,
15       Dr. Harting, so that you know, I'm using your DEA to call
16       in controlled substance prescriptions?  Did you ever at any
17       point in time tell her that?
18   A.  Well, to say it exactly like that wasn't necessary because
19       it's expected.  And she signed on all the charts.  She had
20       to read so I'm sure she saw a great number of any of the
21       patients we saw.  We didn't read it before we gave it to
22       her.
23   Q.  Let's go back again to Dr. Harting's two Collaborative
24       Agreements that were signed by yourself, by Karen Dunning,
25       and by Dr. Harting.  What is -- I'm showing you one of the
```

                                                                  615

Lynch-00004467
Exhibit 5_Page 031

```
 1        Dr. Sheets, and ordered by Kathy L.
 2   Q.   Okay.
 3   A.   So that could very well have been me.
 4   Q.   It actually was you, wasn't it?
 5   A.   Well, I don't know.  We order every day, but, I mean, it
 6        would be fine.  I ordered it.
 7   Q.   Okay.
 8   A.   You know.
 9   Q.   You remember ordering the diet pills under Dr. Sheets's
10        account, correct?
11   A.   At least twice.
12   Q.   And why didn't you order them under your own account?
13   A.   Because if I was coming to his office to work on Wednesday
14        and we were going to work on these, then I asked can I
15        bring the order there or have it delivered when I'm there.
16        He said that was fine.  If he needed something I would add
17        his order to my order and bring it with me.
18   Q.   Now, those pills that you ordered through Dr. Sheets'
19        account with A.F. Hauser, you took a bunch of those back to
20        Kouts and dispensed them, didn't you?
21   A.   Yes.  You can.
22   Q.   Okay.  So you could have just ordered and had them
23        delivered to Kouts where you were several days a week
24        instead of the one day when you were at Dr. Sheets' office.
25        You could have done that, right?
```

626

Lynch-00004478
Exhibit 5_Page 032

```
 1   A.  By UPS.

 2   Q.  All right.  Again, you're telling us that had you chosen,

 3       you could have called up A.F. Hauser and said hey, I need

 4       some Phendimetrazine, I need some Phentermine, I need it on

 5       Thursday, this is Kathy Lynch, they would have taken the

 6       order and they would have delivered it to Kouts Healthcare?

 7   A.  I probably could have.  This was when we were just getting

 8       started.  And we dispensed for five weeks and then were

 9       advised to just stop till we get the laws clarified, which

10       ones we're using.

11                   MR. GENSEL:  Your Honor, may the attorneys

12       approach briefly?

13                   THE COURT:  You may.

14            (Attys. Gensel & King approach the bench.)

15                   MR. GENSEL:  May I approach?

16                   THE COURT:  You may.

17            (Atty. Gensel approaches the witness.)

18                   CROSS EXAMINATION (CONTINUING)

19       BY MR. GENSEL:

20   Q.  You were here when three patients testified, I believe it

21       was Carla Patino-Davis, Alison Sellers, and Heather Dulany?

22   A.  Yes.

23   Q.  Did you remember them as being your patients?

24   A.  Only the middle one.  The older lady.

25   Q.  Okay.  You heard them testify that you -- either you or one
```

628

Lynch-00004480
Exhibit 5_Page 033

```
 1        of your medical assistants actually gave them envelopes of
 2        pills?
 3   A.   Yes, I heard them.
 4   Q.   And you don't deny that that happened?
 5   A.   Well, it was on a log system so the practitioner would have
 6        to log it out.
 7   Q.   Okay.
 8   A.   And give to them.
 9   Q.   All right.  And you kept a dispensing log?
10   A.   We did.  So the practitioner would approve that the
11        numbering system was correct and that it was accounted for.
12   Q.   Okay.  And you believe that was done with those three
13        witnesses or with those three patients?
14   A.   It should have been.  It should have been done with every
15        single one.
16   Q.   All right.  I'm showing you what has been admitted as
17        State's Exhibit 48.  Can you identify that?
18   A.   This is the prescription bottle for Alison Sellers.
19   Q.   Okay.
20   A.   From Costco.
21   Q.   And under who's authority was it called in?
22   A.   This is under Dr. Sheets.
23   Q.   Okay.  And when you had a Collaborative Agreement with him
24        you did that all the time, correct?
25   A.   Yes.  Yes.
```

629

Lynch-00004481
Exhibit 5_Page 034